**UNITED STATES of America,
Appellee,**

v.

**James A. WATSON, Appellant.**

**No. 72–1452.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1973.

Decided Aug. 20, 1973.

Stefan C. Long, Alexandria, Va. (Court-appointed) for appellant.

Joseph A. Fisher, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and MURRAY, District Judge.

WINTER, Circuit Judge:

Defendant was convicted of first degree murder and sentenced to life imprisonment. 18 U.S.C.A. § 1111 (1969). He appeals because he requested, but was denied, the assignment of two attorneys to represent him. 18 U.S.C.A. § 3005 (1969). For this omission, we are obliged to reverse and grant a new trial.

I.

The command of 18 U.S.C.A. § 3005 (1969) is unequivocal. It states:

Whoever is indicted for . . . capital crime shall be allowed to make his full defense by counsel learned in the law; and the court before which he is tried . . . shall immediately, upon his request, assign to him

such counsel, not exceeding two, as he may desire . . . .[1]

The indictment charging defendant was returned January 11, 1972. Shortly thereafter, a single attorney was appointed to represent him and he was arraigned and pleaded not guilty on January 17, 1972. The trial was set for March 27, 1972.

On February 4, 1972, defendant's court-appointed counsel moved for the appointment of co-counsel. He failed to refer to 18 U.S.C.A. § 3005, but assigned as a reason in support of the motion the need for assistance to interview a large number of witnesses before the rapidly approaching trial date.[2] The motion was denied, although then, and again later, when counsel sought a continuance to complete trial preparations, the district court ordered the government to furnish information and to make available witnesses to lessen defense counsel's burdens of preparation. The trial was held March 27, 1972, and, upon the verdict of guilty of first degree murder without capital punishment, the district court sentenced defendant to life imprisonment.

## II.

██ The statute under which defendant was convicted, 18 U.S.C.A. § 1111 (1969), provides that whoever is found guilty "shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life . . . ." As its first argument for affirmance of defendant's conviction despite the district court's failure to comply with § 3005, the government contends that as a result of the Supreme Court's ruling in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), defendant was not accused of a "capital crime" within the meaning of 18 U.S.C.A. § 3005 (1969). Furman held that, with respect to two Georgia cases and one Texas case, "the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. at 239–240. Since the penalty provision of § 1111 is indistinguishable from those challenged in Furman, it is clear that, had the death penalty been imposed on defendant, such a sentence would have been void.[3] From this circumstance the government concludes that defendant was not charged with a "capital crime" at the time his attorney requested additional counsel thereby rendering § 3005 inapplicable to such a request. Aside from the question of whether Furman is retroactive in the context that the government asserts,[4] we are not persuaded.

1. This venerable statute was first enacted as § 29 of the Act of April 30, 1790; 1 Stat. 118. In the respects pertinent to this case, it has existed continuously since that date.

2. Counsel on appeal was not counsel at the trial. The district judge who made the pretrial rulings was not Judge Bryan, the district judge who tried the case.

3. A point the government was quick to "concede" in its briefs.

4. Defendant's request for appointment of additional counsel came on February 4, 1972. Furman was decided on June 29, 1972. Thus, at the time such request was made there existed no rule of law that would have prevented the imposition of the death penalty if defendant were convicted of the offense with which he was charged. A necessary step in the government's reasoning is that the subsequent decision in Furman retroactively determines the proper characterization, on February 4, 1972, of the offense defined in § 1111 for purposes of § 3005. We do not decide the case on this narrow issue. We prefer to rest our decision on a determination of what prospective effect, if any, the Furman decision may have upon criminal procedure statutes, like § 3005, whose operation depends upon the defendant being charged with a "capital offense." If we were to reverse on the narrow ground that Furman cannot retroactively affect the applicability of § 3005, a new trial would be granted. Defendant would very likely renew his request for two appointed attorneys, thereby squarely raising the issue of the prospective effect of Furman. Since that issue has been fully argued in this appeal, considerations of economy of judicial effort and the general importance of the question warrant deciding it now.

In addition to 18 U.S.C.A. § 3005, a considerable number of statutes of the United States and the Federal Rules of Criminal Procedure, as well as many of their state counterparts, are predicated in their operative effect upon the concept of capital crime. Who may admit to bail, 18 U.S.C.A. § 3141 (1969), who may be admitted to bail, 18 U.S.C.A. §§ 3146, 3148 (1969 Ed. and 1973 Cum. Supp.), limitations on prosecution, 18 U.S.C.A. § 3281 (1969), the defendant's scope of discovery in criminal cases, 18 U.S.C.A. § 3432 (1969), his right to peremptory challenges of prospective jurors, Rule 24(b), F.R.Cr.P., and a convicted defendant's right to probation or suspension of sentence, 18 U.S.C.A. § 3651 (1969), all depend upon whether a defendant is charged with a capital offense, a crime punishable by death.

In the case law since *Furman*, no finely developed reasoning has emerged as to whether *Furman* has effected a wholesale repeal of these provisions and their state counterparts. The case most nearly in point is State v. Holmes, 263 La. 685, 269 So.2d 207 (1972), which held that *Furman* does not destroy the concept of a "capital offense." It held that, despite the abolition of the death penalty, the state must continue to apply its statutory and constitutional laws requiring unanimous juries and jury sequestration to crimes formerly punishable by death. The court reasoned that *Furman* cannot be assumed to have affected statutes other than those dealing with imposition of the death penalty, and concluded that it should leave the task of harmonizing ancillary statutes to the state legislature.

The cases on the application of *Furman* to state constitutional and statutory provisions forbidding bail in certain capital cases are split. Those holding that despite *Furman*, bail is not available, reason that the classification is based not on the potential punishment but on the gravity of the offense. People v. Anderson, 6 Cal.3d 628, 657 n. 45, 100 Cal.Rptr. 152, 171–172 n. 45, 493 P.2d 880, 889–890 n. 45 (1972); People ex rel. Dunbar v. District Court, 500 P.2d 358 (Colo.Sup.Ct.1972) (Per Curiam); State v. Flood, 263 La. 700, 269 So.2d 212 (1972). Those cases holding that after *Furman* bail must be available, reject the logic that the nature of the crime remains the same and that exposure to a life sentence justifies denying bail. State v. Johnson, 61 N.J. 351, 294 A.2d 245 (1972); Ex parte Contella, 485 S.W.2d 910 (Tex.Cr.App.1972); Commonwealth v. Truesdale, 449 Pa. 325, 296 A.2d 829 (1972); *See* Commonwealth v. Hollowell, 11 Cr.L. 2070 (Phila.Ct. of Common Pleas, March 14, 1972) (bail available pending retrial where sentence on now reversed conviction was life, not death). It should be noted, however, that the bail cases differ from provision for a second attorney, because the bail classification relates primarily to the nature of the offense as it affects society, and not to the nature of the risks or complexities facing the defendant at trial.

■ We start from the premise that *Furman* did no more than hold that imposition of the death penalty under statutes, which created a range of possible sanctions, including execution, was unconstitutional in an historical context of extremely rare and apparently arbitrary resort to that penalty. From the plurality of opinions which were filed in *Furman*, we cannot be certain that *Furman* forecloses all statutory schemes for imposition of capital punishment. It appears, however, that *Furman* neither repealed statutes, such as § 1111, which contain death penalty provisions that probably cannot be constitutionally applied, nor did it repeal statutes such as § 3005 which depend for their operation on the defendant being charged with a "capital crime." In a very literal sense, the offense defined in § 1111 is still a "capital crime;" the *statute* still authorizes the imposition of the death penalty and Congress has not repealed it. Nor has Congress amended any of the statutes creating special procedural rules in capital cases in response to the *Furman* decision. We are urged by the govern-

ment to fill in a gap created by Congressional inaction on the basis of our belief that the death penalty may no longer be constitutionally imposed on defendant. Courts are very naturally hesitant about drawing solely upon their own authority to repeal *pro tanto* Congressional enactments. However, exceptional circumstances would justify a court in removing from the literal scope of a statute a case to which the application of such statute could not conceivably serve any of the purposes that motivated Congress to enact it. *See* Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). Were we convinced that defendant's exposure to the risk of imposition of the death penalty was the sole reason for the two-attorney requirement in § 3005, we would be inclined to agree with the government. However, we believe that there is a significant chance that other considerations also underlay the two-attorney requirement.

The legislative history of the Act of April 30, 1790, and its successive amendments to the present 18 U.S.C.A. § 3005, is relatively unrevealing. Of course, when it was enacted, treason, willful murder, piracy and forgery or counterfeiting of a public security of the United States were all punishable by death alone. It can, of course, be inferred, from the fact that the only punishment was death, that the inevitability of death as punishment in the event of conviction was the sole reason why Congress directed that one accused of a capital offense should be entitled to two lawyers if he requested them. On the other hand, the class of cases in which Congress retained the death penalty has diminished over the years. Presently, only such serious crimes as treason, 18 U.S.C.A. § 2381 (1969), first degree murder, certain types of kidnapping, 18

U.S.C.A. §§ 1201, 1751 (1969 Ed.1973 Cum.Supp.), certain types of bank robbery, 18 U.S.C.A. § 2113(e) (1969), and homicide resulting from certain postal infractions, 18 U.S.C.A. § 1716 (1969), purportedly carry a possible death penalty, although for none has Congress provided that death is the *sole* penalty. Not every capital crime is a complex one and not every capital crime arises from a complex set of facts which would require extensive investigation and trial preparation by defense counsel. Yet it seems to us that it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try.[5] The kinds of crimes made punishable by death are usually such as to generate revulsion in the trier of fact and, as a result, a high degree of prejudice if the trial is not conducted strictly in accord with recognized procedures, including the rules of evidence and burden of proof. It is not unlikely that Congress may have also sought to buttress the defense with two attorneys to provide greater assurance that a defendant's rights would be fully observed. As a consequence, we are unable to say, absent a clear legislative expression, that the possibility of imposition of the death penalty was the *sole* reason why Congress gave an accused the right to two attorneys. It follows that we cannot say that *Furman* effects a judicial repeal of § 3005.

We have no doubt that *Furman* raises pointed legislative questions of whether § 3005 should not be repealed or whether the various provisions of Title 18 which purport to authorize the imposition of the death penalty should be amended in an effort to harmonize them or to validate them under *Furman*, or even under United States v. Jackson, 390 U.S. 570,

5. It is worth noting that the problems confronting Watson's defense were relatively complex. His theory was self defense. The killing was witnessed by a large number of persons whose testimony would be crucial to the establishment of the privilege of self defense. Many of these persons were members of a prison population. Such persons are often reluctant to testify truthfully as to their knowledge of crimes committed by prisoners upon their fellows. Thus, large numbers of witnesses who had to be handled with extreme care needed to be interviewed in preparation for trial.

88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).[6] But we conceive these to be legislative questions and not judicial ones, especially when a holding by us that *Furman* has effected a repeal of § 3005, of necessity, would probably create serious doubt as to whether the various other provisions of Title 18 and the Federal Rules of Criminal Procedure, to which we have referred, have also been repealed. The question of whether these statutes and the rule should now be repealed merits the prompt consideration of Congress and the Rules Committee, but we regard our role as one of proceeding with caution unless and until it unmistakably and clearly appears that *Furman* has had this effect. This, we fail to find.

We therefore hold that, notwithstanding *Furman*, defendant had an absolute statutory right to two attorneys under § 3005.

### III.

■ Having concluded that defendant was denied a right that he possessed and sought to exercise to have two attorneys under § 3005, we turn to the government's argument that nonetheless defendant's conviction should not be disturbed because he was not prejudiced by denial of the right. The government contends that defendant's single attorney presented a perfectly adequate defense, that there was nothing another attorney could have done, and that the major problem confronting the single lawyer, the number of potential witnesses, was met or at least alleviated by the district court's ordering extraordinary discovery.

From the record, it is possible to conclude that defendant was fairly tried

and the evidence of his guilt was substantial, if not overwhelming, and from this it may be inferred that defendant was not prejudiced by the denial of his right. In this connection, however, we recognize the almot insuperable difficulty which would be placed upon any defendant, if the burden is placed on him, to show *post hoc* that he was prejudiced by denial of his right to two attorneys. In Smith v. United States, 122 U.S.App. D.C. 300, 353 F.2d 838, 845–46 (1965), cert. denied, 384 U.S. 910, 974, 86 S.Ct. 1350, 1867, 16 L.Ed.2d 362, 684 (1966), it was held that the failure to advise a defendant of his right to two attorneys under § 3005 created a presumption of prejudice so that the burden of disproving it was shifted to the government.

The cases which the government cites to support its contention that a § 3005 case turns on its facts do not address the instant issue and are distinguishable. In United States v. Davis, 365 F.2d 251 (6 Cir. 1966), the issue was whether the defendant had the right to replace his two court-appointed counsel at will. The court said no. In Crum v. Hunter, 151 F.2d 359 (10 Cir. 1945), cert. denied, 328 U.S. 850, 66 S.Ct. 1117, 90 L. Ed. 1623 (1946), the court held only that the defendant in a capital case has no right to two counsel unless he requests two. In the instant case, defendant requested two attorneys. In *Smith*, supra, the issue was whether the district court erred in failing to advise the capital defendant of his right to two counsel. The court held that the district court should inform the defendant of this right, that prejudice will be presumed if it does not, but that this presumption was overcome by sole defense counsel's

6. *Jackson* held invalid the portion of 18 U.S. C.A. § 1201(a) which permitted a *jury* in a kidnapping case where the victim suffered harm, to specify that the death penalty should be imposed and which failed to permit any comparable imposition of the death penalty upon a plea of guilty. Pope v. United States, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), reached the same result with regard to 18 U.S.C.A. § 2113(e) which permitted a *jury* to direct the imposition of capital punishment when a person was killed in the com-

mission of a bank robbery but failed to permit a judge the same sentencing alternatives upon a plea of guilty. The rationale of the decisions was that both statutes encouraged pleas of guilty and placed an impermissible burden upon a defendant's right to be tried and not to incriminate himself. These statutes should be contrasted with ones like 18 U.S.C.A. § 1111, which prescribes death as the penalty for first degree murder unless the jury prescribes clemency.

**1130**

vigorous defense, by the fact that there was no challenge to the overwhelming evidence (insanity defense), and by the fact that the defendant was not sentenced to death. In dictum, *Smith* unequivocally declared: "If the substance of his request had been that he desired the appointment of additional counsel . . . additional counsel would have been required. Section 3005 provides an *absolute* right to additional counsel when requested." 353 F.2d at 845 (emphasis added). See *Davis*, supra.

We reject the government's argument. Section 3005 is unequivocal in its terms. We have no right to rewrite it, nor have we any right to provide a district court with the discretion to apply it that Congress purposefully and unambiguously withheld. Since in our view, the statute would be eviscerated by application of the harmless error doctrine, we perceive no alternative but to enforce it.

The judgment entered upon conviction is reversed and defendant is awarded a new trial. Since the other errors of substance claimed by defendant are unlikely to arise on retrial, we need not consider them.

Reversed; new trial granted.

HERBERT F. MURRAY, District Judge dissenting:

I dissent. In my view, the sole reason Congress gave an accused charged with a capital crime the right to two attorneys was the possibility of imposition of the death penalty. When the Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) abrogated the death penalty, the crime of murder with which Watson was charged no longer was a capital crime. It necessarily follows that his otherwise undoubted right under Title 18, Section 3005 to have a second counsel appointed on his request disappeared. Therefore, his rights have not been violated and the conviction below should be affirmed.

It is somewhat remarkable that the two counsel provision of Title 18, Section 3005, which has existed continuously in our law since 1790, is without any explanatory comment that the diligence of court and counsel can discover. The founding fathers, so eloquent on many of our other basic rights, seem to have maintained an unbroken silence with regard to this provision.

It does appear that they took pains to depart from the English practice with regard to the right of counsel. The harsh rule of the English common law permitted counsel in misdemeanor cases, but denied it in cases of felony or treason. Felony defendants were not allowed to testify, to call sworn witnesses on their behalf or see their charges before trial.[1] It was not until 1695 that Parliament adopted a statute permitting representation by counsel in cases of treason.[2] The same right was not extended to all felony cases until 1836, nearly half a century after the Sixth Amendment was added to the American Constitution.[3] Contrastingly in this country, as Justice Sutherland noted in his extensive historical review in Powell v. State of Alabama, 287 U.S. 45, 64, 53 S.Ct. 55, 62, 77 L.Ed. 158 (1932):

"It thus appears that in at least twelve of the thirteen colonies the rule of the English common law, in the respect now under consideration, had been definitely rejected and the right to counsel fully recognized in all criminal prosecutions, save that in one or two instances the right was limited to capital offenses or to the more serious crimes; and this court seems to have been of the opinion that this was true in all the colonies."

In adding the right to additional counsel in capital cases, it seems obvious that the reason for it was the finality of the punishment involved, not any inherent complexity of capital cases. Many such cases are much simpler and easier to try

1. Lewis, Gideon's Trumpet, Chapter 8, p. 104.
2. 7 & 8 Wm. III, c. 3, Sec. 1 (1695).
3. 6 & 7 Wm. IV, c. 114, Sec. 1 (1836).

from the point of view of counsel than, for example, a multi-defendant narcotics conspiracy trial. The writer of this opinion believes that in a desire to guard against human error, the first Congress felt it desirable to have two lawyers keeping watch on each other when the life of the client was at stake.

When the death penalty is abolished, admittedly it gives rise to difficulties in the administration of the criminal law. However, these difficulties are not insuperable [4] and in regard to the statutes mentioned in the majority opinion, could be solved judicially on a case by case basis or by the Congress.

4. See Donaldson v. Sack, 265 So.2d 499 (Fla. 1972); Commonwealth v. Truesdale, 449 Pa. 325, 296 A.2d 829 (1972); State v. Pett, 253 Minn. 429, 92 N.W.2d 205 (1958).